[ Filed December 23, 1889. ]

## C. H. WHEELER, RESPONDENT, v. ELLA WHEELER, APPELLANT.

CONTRACT OF MARRIAGE—ITS NATURE.—The contract of marriage, unlike ordinary contracts, the State is specially interested in preserving unbroken, and the contracting parties cannot annul it, nor the court, except for the causes specified in the statute, and only then upon satisfactory evidence that such cause or causes exist.

DIVORCE—RECRIMINATION.—Where the party asking for a divorce is liable to a charge which is a cause for divorce, it will prevent him from obtaining such divorce, although the wife may have misconducted herself.

APPEAL from the circuit court for Multnomah county.

*James Gleason*, for Respondent.

*Williams & Wood*, and *F. V. Drake*, for Appellant.

LORD, J.—The facts are these: On March 8, 1889, the appellant, Ella Wheeler, filed her complaint against the respondent, C. H. Wheeler, based on a late Act of the legislature, to compel her husband, the respondent, to contribute to her support. The respondent appeared and answered, and at the same time filed a complaint for a divorce from the appellant, his wife; but in his answer, among other things, set forth the fact that he had commenced a suit for divorce against his wife, and prayed a suspension of proceedings until the determination of his suit for divorce. In the proceedings for divorce, the respondent answered, denying all the material allegations, and alleging his neglect to provide a support for her, etc., and praying that his complaint might be dismissed. After all issues had been joined in the divorce

suit, the evidence was taken and the case argued by counsel, and the court found that the appellant had been guilty of cruel and inhuman treatment toward the respondent by the use of opprobrious epithets, false accusations of marital infidelity, and exasperating conduct, etc., and as a conclusion of law found that the respondent was entitled to a divorce, which was decreed, and also entered a decree dismissing the petition for support, from both of which decrees the appeals are taken.

As the cases stand the suit for divorce must be first disposed of, and when that is done the petition for support can be easily determined upon the facts as disclosed by this record.

The ground of the complaint is cruel and inhuman treatment, and indignities, rendering life burdensome.

The particular acts which make up the gravamen of these charges consist in accusing the defendant of adultery, calling him opprobrious names, and the habit contracted by the defendant in drinking whisky and using morphine, all of which, it is alleged, greatly annoyed the respondent and made his life burdensome.

Passing the criticism suggested as to the complaint, and entering directly upon the merits with as little detail as possible, our first duty is to inquire whether the respondent has proven or sustained the allegations of his complaint. And in pursuing this inquiry it is our duty to remember that the contract of marriage, unlike other contracts, the State is specially interested in preserving unbroken, and that the contracting parties cannot annul it, nor the court, except for the causes specified in the statute, and only then when satisfactory evidence that such cause or causes exist. "Divorces," said Strong, J., "ought never to be decreed without clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce." Edmund's Appeal, 57 Penn. St. 234. The evidence discloses that the respondent is a physician, and was married to the appellant in December of the year 1881. The first charge he makes is, that the appellant

accused him of adultery with one of his patients in a little over a year after their marriage, but it is evident from his own testimony, if it shall be considered that such an accusation was made, that he did not treat it seriously, nor did it cause him any mental concern, sufficient, at least, to disturb his happiness and render his life burdensome. Whatever may have succeeded that period, his own evidence bears testimony, which covers this charge, that their married life was tranquil and happy, free from bickerings and quarrels, or any causes or accusations to irritate or disturb its peaceful tenor.    The appellant flatly contradicts it, and under the rules of law, which must guide us, the allegation is not proven.    The next count against the appellant is, that without cause or provocation, she applied, in a loud and violent manner, opprobrious epithets to the respondent, in the presence of other persons, greatly to his mortification and annoyance.    It appears, at the time when this scene occurred, that it was the occasion commonly known as the Villard demonstration, in honor of the completion to Portland of the N. P. R. R., and suffice it to say, that it was an important event which the citizens sought to make memorable by various public demonstrations during the day and illuminations during the evening.    Necessarily on such an occasion, the spectacular displays were numerous and attractive, the streets thronged with sight-seekers on foot and in carriages, to witness the various displays designed for amusement and entertainment, and altogether the celebration was not only conspicuous for general rejoicing and congratulations, but it furnished an opportunity for many pleasant social interchanges among friends and acquaintances.    Without detail, on the last evening of the celebration the respondent took his wife down town in her buggy, drove around the streets a short time, and then took her home, and as he was driving back, at the instance of a friend, took his wife in the buggy and again drove around for awhile, and then back to the livery stable, where, as he says, his wife met him, all ablaze

with indignation, and applied to him violent and abusive names.

The appellant's version of this affair is that she was anxious to see the sights and enjoy the celebration, and that her husband only drove around, while she was with him, about a half of an hour, early in the evening, between 8 and 9 o'clock, and then took her home, and, contrary to her wishes and despite her protests, required her to return to her rooms, promising to return himself immediately. Instead of doing this he was spending the remainder of the evening in the way described by himself, and when he returned to the livery stable she confesses to have been indignant and to have reproached him for his conduct. He claims, also, that his object in driving back after he left her was to attend to a business engagement, and that the incident of taking another lady riding was merely accidental. Be that so, and still his conduct was not free from fault, and did much to provoke the outburst from his wife. It was an occasion when it was natural that she should wish to enjoy the scenes and sights as others were doing; and why should she be deprived of this pleasure? She remonstrated, but of no avail, and when she found that another lady had supplied her place, concede there was nothing improper, it was in the nature of the circumstances that she should be resentful and indignant. Better, no doubt, it would have been to have restrained her temper and her tongue; but better, too, it would have been if he had on such an occasion granted his wife's reasonable request, especially when no circumstance is disclosed by the evidence to justify its refusal. A review of all the circumstances in connection with this unhappy affair, which seems to be the point in their lives when their paths began to diverge, and the charges alleged in respect to the same lady in the succeeding paragraph of the complaint, exhibit only contradictory and conflicting statements in many particulars, mutual faults and recrimination, and in both an absence of a spirit of forbearance and conciliation.

There is, however, one of the specifications in which it

is alleged that the appellant accused the respondent of adultery with one Mrs. C., which is admitted.   As to this woman, the testimony of both agree that such accusations were made, and it is important to ascertain whether they were made in good or bad faith, and all the circumstances in which such accusations originated.   His testimony is as follows:

"Mrs. C. was a patient of mine; she was living with her husband at the Merchant's hotel, and would come to the office.   For some reason Mrs. Wheeler supposed she was coming there for other purposes than professional.   She was purely a professional patient.   Her presence would create such anger in Mrs. Wheeler that she was simply wild.   She would exclaim: Why do you have that woman running here after you?   What do you want her coming here for?   Why do you permit it?   And finally I told the lady that she must not come to the office any more.   She accused me of having intercourse with the woman, and would go into a rage; would make her appearance where she could see her, and she saw everybody that came."

There are circumstances connected with the accusations at the time made and his conduct in respect to them that furnish, at least, reasonable ground for suspicion, and when this is the consequence such charges are not made wantonly and in bad faith.   If a wife has reason to suspect her husband of infidelity, it is not cruel or inhuman to charge him with it.   *Kennedy* v. *Kennedy*, 73 N. Y. 374. Nor is it a matter of surprise that it should cause her annoyance and irritation, which she would exhibit in rudeness of language and of temper.   To avoid prolixity and obviate any more than a reference to this disgusting affair, I shall forbear giving her version of the matter in detail and content myself with saying that his conduct about the possession of the napkin, and the determined resistence he manifested to it, is hardly consistent with the trifling and inconsequential cause to which he ascribes it.   There is something significant, too, in the fact that as a witness the respondent does not swear that his wife's accusations as to

this woman were false, or that he was not guilty as charged. It is not our purpose to say that he was, only that his conduct furnishes ground for suspicion, and that when his wife thought she had discovered the proof, his acts were more consistent with guilt than innocence. The bare facts are, that shortly after this woman's visit at his office, and when his wife believed the adultery was committed, a napkin was found which she claimed bore evidence of the adulterous act, and he claimed was caused by cleaning an apple, there ensued a scene—a row—marked by conduct on her part that plainly indicated that she was intensely jealous and enraged, and uttered, whether true or false, her honest convictions of his infidelity, and by conduct on his part that exhibited a fierce determination to prevent her from obtaining the possession of the napkin, as if it contained some "damning proof" of his guilt. In this view the circumstance was unworthy of the demonstration he exhibited, and in her view it was consistent with the guilty act which she charged, so that while she made the charges and admits them, she made them in good faith and believing them to be true. The last allegation, in which he alleges she accused him of adultery, was with a young lady visiting them from Oakland, Cal., all of which is as specifically denied by her. Their testimony in respect to this charge is in irreconciliable conflict, but the circumstances of her visit, of their old friendship, of the young lady's accomplishments, and the fact that his wife and this young lady continued to be friends afterward and interchanged letters, and all the facts connected therewith, do not furnish any reason for such accusation, and his wife not only emphatically denies it, but expresses extreme chagrin that the young lady should have been made the subject of such an allegation in the complaint.

This ends all the allegations in respect to the charges of adultery alleged to have been made by the appellant against her husband, and there only remains to be considered two other specifications of conduct on the part of his wife, which, he avers, greatly annoyed him and rendered his life

burdensome.    The chief of these consists in the habit,
which, he alleges, she contracted since marriage, of drink-
ing whisky and using chloral and morphine, and he speci-
fies one occasion in which he found her on the floor in a
state of stupor from its effects, and that when aroused she
behaved in an indecent and unladylike manner.    There is
no proof in this record that the appellant was addicted to
drinking or the use of opiates as a contracted habit.    Take
all his testimony on this point, and exclude all other, and
the amount used would not be sufficient to indicate a habit.
The instances referred to of purchases by her are singu-
larly few, for one supposed to be afflicted with this habit,
and the one relied upon turns out, upon independent testi-
mony, not to have been whisky, but claret ordered for
domestic purposes.    She denies the whole matter *in toto.*
.I have looked through the testimony, and I can find no evi-
dence upon which to sustain the charge.    That she was at
times nervous and excitable, and that, with the concurrence
of her husband, another physician was called in on one
occasion, and that it was their joint opinion that some opi-
ate had better be administered, is true.    But there is noth-
ing in that occasion or the circumstances which indicates
that she was in that nervous and excited condition as the
result of the whisky or opium habit.    That she may have
indulged in these things occasionally may be true; the evi-
dence of her husband would lead to that inference, but it
falls far short of the allegations to which she has responded
by denial.    So, too, I am inclined to the impression, taking
their testimony as a whole, that, whatever may have been
her condition on the particular occasion which forms the
specification of this charge, she behaved in an unlady-
like manner, and exhibited a rudeness of temper and speech
of which she ought to be ashamed.    But, in admitting this,
the inference is not to be drawn that I think the allegation
is sustained by the evidence, or, if it was, in view of some
acts and circumstances to which I shall presently refer,
although she may have caused him annoyance and discom-
fort, that he is entitled to a divorce.    The fact is that he

does not swear directly that he ever saw his wife intoxicated by the use of whisky, but seeks to insinuate the habit of its use, and the inference of drunkenness on the occasion referred to. The last ground of complaint is that his wife kept up a system of espionage upon his actions and his patients; that in cleaning the steps she would sweep the dust into the face of his lady patients, and that she refused to attend to her domestic duties, etc. There is no doubt that his wife was jealous, and, like all such, was spying on his actions and perhaps some of his patients, annoying him and making herself ridiculous. There is some evidence, too, that in cleaning the stairs leading to her husband's office she swept the dust in the face of a lady ascending. Her own explanation of the affair is that it was an accident, and the form of the stairs has some tendency to confirm it, or at least that it would occur in the way she has explained. As to the refusal to cook meals, wash dishes, etc., these only indicate the state of mind resulting from their altercations, occurring more frequently until the end is reached in separation and these proceedings. In this case the husband occupies the position of assailant, and in the view thus far considered I have searched only for evidence, *pro* and *con*, in proof and disproof, of the causes alleged in the complaint.

The evidence has not been of that clear and satisfactory character upon which courts of equity act in suits for divorce, and the result is that the relief prayed for must be denied. But there are some other facts which have been admitted, bearing on the conduct of each, that emphasizes our duty as to him, and weakens her claim to consideration for support. Their joint evidence bears testimony that the first years of their married life were tranquil and happy, but after the Villard celebration the clouds began to lower and their paths to diverge.

She became jealous, and trifling circumstances were often regarded with suspicion and distrust, and sometimes seemed to make her frenzied with excitement and passion. At such times her temper was resentful and belligerent

and she exhibited no spirit of conciliation or concession for the sake of peace and harmony, but she retaliates to the full extent of her ability, and often with much success.   Nor does she seem on many occasions to justly appreciate her duties and responsibilities, but acts without a proper regard for his feelings or wishes, and in a spirit and manner calculated and designed to annoy and exasperate him.   But while we cannot approve or justify her conduct, yet much of it was provoked by him, and can find no palliation or justification of his ill-treatment of her. By his own confession he has more than once brutally beaten her, and his only apology was that he was aggravated beyond control.   "I struck her upon the face and blacked her eyes.   I poulticed her eyes and done everything I could in order to try to allay whatever damage I had done, but I was exasperated beyond control."

A great judge more than a half of a century ago said: "The moral sense of this community at this day revolts at the idea that a husband may inflict personal chastisement upon his wife, even for the most outrageous conduct." Richardson, J., in *Poor* v. *Poor*, 8 N. H. 313.   There is no doubt that he felt badly after the assault and regretted it, for she says:   "When I recovered consciousness I was lying on the floor, and he was bathing the blood from my face and crying.   He felt very badly and said he thought he had killed me."   Nor was this the only occasion he laid violent hands upon his wife, and wronged and insulted her with barbarous blows, at the bare mention of which his cheeks ought to tingle with the blush of shame.   However outrageous her conduct, or however much it may have harassed and exasperated him, the moral sense of this age will not permit a husband to find redress for his grievances in the degrading and cowardly task of inflicting personal chastisement on his wife.   But we forbear further enumeration.   While he charges his wife with abusive epithets, he admits that he retaliated in kind, and as two wrongs never made one right, in view of her testimony that he called her the vilest names, he has no standing upon this

ground.    There is another matter bearing on the relations of those parties that cannot well be omitted.

In consequence of his remaining out of nights to play poker he admits that she frequently and bitterly remonstrated with him about his absence, and when asked if its effects were not to make her nervous and excited, he answered: "Probably it excited her as much as her actions excited me." In her testimony she says she remonstrated with him,—"begged him; I implored him on my knees and told him it was killing me; that it would drive me insane; that I could not stand the mental strain." She evidently felt that the habit was gaining the ascendency and breaking down the moral forces of his character when the fatal allurements of the gambling table could supplant the attractions of home and consign her to loneliness and neg-lect, and foreshadowed in her mind the wretchedness and desolation which would ultimately come upon their lives and darken their hearthstone. It is hardly necessary to pursue the investigation further, for, to put the case most favorable for the respondent, he was guilty at least of such conduct as would prevent him from obtaining a divorce. In considering these charges, it may not be amiss to say that the parties and their witnesses are all strangers to me, and that I have endeavored, where I could, to throw a mantle over their faults and errors. Had the conduct of the wife been different—free from blame—her petition for support would be entitled to consid-eration. But the fact cannot be ignored that her conduct has been resentful and unforgiving and subjected her hus-band to many annoyances, often for the evident purpose to exasperate him; nor has she evinced a proper regard for his wishes in their household affairs, or discharged her duties, under the circumstances, in a way calculated to soften asperities of temper or to promote domestic peace and harmony. We are unable, therefore, to allow her the relief for which she asks; but on her return, or when she changes her conduct and puts herself in a position that

puts him in the wrong, this court will be open to her relief.

It follows that the decree for divorce must be reversed and the bill dismissed.